UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-mj-4616

UNITED STATES OF AMERICA

vs.

ALON ALEXANDER, and
OREN ALEXANDER

    Defendants,

_____

SUPPLEMENTAL MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR PRETRIAL RELASE

The government respectfully submits this brief supplemental memorandum in further opposition of the application for pretrial release by the Defendants, Alon Alexander and Oren Alexander. Specifically, the government writes to address the proposed bail package, which amounts to a private jail in the residence of a family friend.

"[T]he Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails." *United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019). This principle protects the Constitution's guarantee of equal protection and ensures all defendants—poor, wealthy, and even the uber-wealthy—are treated the same under the law. The Defendants here seek to circumvent this basic tenet of justice and buy their way out of jail by hiring guards to watch them inside a luxury condo. The Court should deny the Defendants' attempts to leverage their wealth to receive special treatment. As an initial matter, the law forbids it under the circumstances. Moreover, the Defendants' proposed private security solution, an arrangement that literally puts the guards in the employ of the inmates, cannot satisfy the requirements of the Bail Reform Act.

For these reasons, and as described in the government's prior submission and during argument before the Court, the Defendants should remain detained pending trial.

Alon Alexander, Oren Alexander and their brother and co-defendant, Tal Alexander, have joined a group of wealthy individuals charged with sex trafficking and similar offenses who have attempted to buy their way out of federal detention by funding their own private jails. Courts presented with these proposals have rejected them for what they are: efforts to use money and privilege to receive special treatment in the justice system. *See, e.g.*, *United States v. Combs*, No. 24 Cr. 542 (AS), 2024 WL 4903741, at *3 (S.D.N.Y. Nov. 27, 2024); *United States v. Maxwell*, 510 F. Supp. 3d 165, 177 (S.D.N.Y. 2020); *United States v. Epstein*, 425 F. Supp. 3d 306, 326 (S.D.N.Y. 2019); *United States v. Raniere*, No. 18 Cr. 204 (NGG), 2018 WL 3057702, at *7 (E.D.N.Y. June 20, 2018); *United States v. Valerio*, 9 F. Supp. 3d 283, 296 (E.D.N.Y. 2014).[1] At least two flaws in those private jail proposals are similarly fatal to the Defendants' proposal here: First, the Bail Reform Act, except in a very limited circumstance, forbids usings privately funded detention as a condition of bail. And second, by its very nature, private guards are a poor, ineffective substitute for actual pretrial detention of a defendant.

In *United States v. Boustani*, the Second Circuit directly confronted this issue and held that the Bail Reform Act permits the use of private guards to avoid pretrial detention only where the

---

[1] Although *Boustani* and many of these district court cases relying on that decision are from the Second Circuit, they are directly relevant to the circumstances here. *See also United States v. Bothra*, No. 19-1953, 2019 WL 8883664, at * 2 (6th Cir. Nov. 5, 2019) (describing *Boustani*'s reasoning as "persuasive"); *United States v. Rudolph*, 582 F. Supp. 3d 804, 817 (D. Colo. 2022) ("the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails") (quoting *Boustani*); *United States v. Freitekh*, No. 20 Cr. 435, 2022 WL 1415666, at *2 (W.D.N.C. May 4, 2022) (same). Moreover, any decision from this Court on pretrial detention, if appealed, would be heard in the Southern District of New York, where the indictment against the Defendants was returned and where *Boustani* is binding law.

2

defendant is detained on risk of flight premised on his wealth. "[A] defendant may be released on such a condition only where, *but for* his wealth, he would not have been detained." *Boustani*, 932 F.3d 82 (emphasis in original). This, however, is the exception to the rule. Where, as here, there are additional factors that require detention—including other factors going to risk of flight—the use of private security guards is not permitted under the Bail Reform Act. *See id.* ("[I]f a similarly situated defendant of lesser means would be detained, a wealthy defendant cannot avoid detention by relying on his personal funds to pay for private detention."); *see also Maxwell*, 510 F. Supp. 3d at 177 ("the Defendant's argument that private security guards could ensure her appearance at future proceedings runs afoul of the Bail Reform Act" because the defendant "would be detained regardless of her wealth"). Circumstances beyond a defendant's wealth that justify pretrial detention, and thus which cannot be mitigated legally through the use of private guards, include, "the seriousness of the charged offenses and the lengthy possible sentence [a defendant] would face if convicted"; the strength and nature of the evidence against the defendant; and a defendant's "personal characteristics, including . . . 'frequent international travel . . . and extensive ties to foreign countries without extradition.'" *Boustani*, 932 F.3d at 83; *see also* 18 U.S.C. § 3142(g).

One upshot of this is that private guards and private detention cannot be relied upon to mitigate the danger a defendant presents to specific individuals or the community or the danger that he will attempt to harass and intimidate witnesses or obstruct justice.[2] But even focusing on

---

[2] The government continues to strongly believe that the Defendants present an extreme danger to the community and that private security would be inadequate to ensure the safety of the community. *See United States v. Agnello*, 101 F. Supp. 2d 108, 114 (E.D.N.Y. 2000) (rejecting home detention, with electronic monitoring, video surveillance, and 24–hour guard posted outside home, and other restrictions, and noting that "[t]hese measures, albeit elaborate, do not assure the safety of other persons and the community in a manner remotely commensurate to pretrial detention in a government facility"). However, because this Court focused on whether private security could ensure the Defendant's appearance in court in its questions at the end of the

3

the risk of flight, as the district and circuit courts did in *Boustani*, this is a case where the non-wealth factors require the Defendants to be in-custody pending trial to reasonably assure their appearance in court. *See Boustani*, 932 F.3d at 83 ("It is clear that the District Court did not rely primarily on Boustani's personal wealth in finding that he posed a flight risk. Rather, his wealth was one of many factors the Court considered."); *see also United States v. Boustani*, 356 F. Supp. 3d 246, 256-58 (E.D.N.Y. 2019). As Judge Reid noted only three weeks ago when ordering the detention of the defendants' brother and co-conspirator Tal Alexander, it is many factors working together—not only the Defendants' financial resources—including "the strong weight of the evidence; the significant sentence the Defendant faces; and the nature and circumstances of the offense; and the personal characteristics of the Defendant," that require pretrial detention based on risk of flight in this case. *United States v. Alexander*, No. 24 MJ 4544, Dkt. No. 24 at 3-4 (S.D. Fla. Dec 17, 2024) (hereinafter, "T. Alexander Det. Order"); *see also United States v. Alexander*, No. 24 MJ 4544, 2024 WL 5186469, at * 2 (S.D. Fla. Dec. 20, 2024) (order denying motion to reopen detention hearing).

The same considerations that supported Judge Reid's decision to detain the co-defendant are present here as well. In fact, most of the factors demonstrating that Alon and Oren Alexander are serious flight risks have little to do with their wealth. These include, *inter alia*, the nature of their crimes, the possible life sentences they face, the fifteen-year mandatory minimum sentences they face, the prospect of "both incarceration and reputational harm," the strength of the evidence, including the "testimony of numerous victims and witnesses, electronic evidence, physical evidence, and documentary evidence," the Defendants' international contacts, and their frequent

---

December 30, 2024 preliminary detention hearing, the government has focused this letter on risk of flight.

international travel. *See* T. Alexander Det. Order at 3-4. The Defendants' wealth only exacerbates an already clear risk of flight.[3] And just as a defendant of lesser means in the same situation would be detained pending trial (including a defendant with foreign contacts and sufficient wealth to pay for travel but insufficient wealth to hire around-the-clock private guards until a trial concluded), so too must the Defendants be detained here.

Setting aside, however, the impropriety of a private security bail condition under the circumstances of this case, it is also clear that private security would be ineffective and insufficient to ensure the Defendants' appearance in court as required for several reasons.

*First*, there is an inherent conflict of interest present when the prisoner is the one paying his own jailers. *See Epstein*, 425 F. Supp 3d at 326 (noting that there is a "conflict that is created by the salary the 'trustees' are earning from the Defendant and their purported role as independent monitors. (The same problem arises in relation to private 24/7 security guards.)"); *Boustani*, 356 F. Supp. 3d at 257 ("Guidepost employees would face a clear conflict of interest—private prison guards paid by an inmate."); *United States v. Tajideen*, 17-CR-46, 2018 WL 1342475, at *6 (D.D.C. Mar. 15, 2018) ("While the Court has no reason to believe that the individuals selected

---

[3] The defendant's reliance on *United States v. Napout*, No. 15 Cr. 250 (PKC) (E.D.N.Y.), which preceded the Second Circuit's decision in *Boustani*, is misplaced. *See* Dkt. No. 8 at 8-9. The Defendants' risks of flight are based on many factors that go beyond their wealth that were not present in *Napout*. Among other differences between the cases, *Napout* was a fraud and money laundering case where the defendant faced no mandatory minimum sentence and was unlikely to receive a sentence of multiple decades or longer. Here the Defendants face both a fifteen-year mandatory minimum and a likelihood of sentences of multiple times that length. Recent examples in the Southern and Eastern Districts of New York show that the Defendants, who are charged with sex trafficking, not fraud, are likely to receive sentences significantly longer than the 108 months to which Napout was ultimately sentenced. *See United States v. Raniere*, No. 18 Cr. 204 (NGG), Dkt. No. 969 (E.D.N.Y. Oct. 30, 2020) (120-year sentence); *United States v. Maxwell*, No. 20 Cr. 330 (AJN), Dkt. No. 696 (S.D.N.Y. June 29, 2022) (20-year sentence); *United States v. Ray*, 20 Cr. 110 (LJL), Dkt. No. 615 (S.D.N.Y. Jan. 31, 2023) (60-year sentence); *United States v. Paduch*, 23 Cr. 181 (RA), Dkt. No. 186 (S.D.N.Y. Nov. 21, 2024) (life sentence).

5

for the defendant's security detail would intentionally violate federal law and assist the defendant in fleeing the Court's jurisdiction, it nonetheless is mindful of the power of money and its potential to corrupt or undermine laudable objectives. And although these realities cannot control the Court's ruling, they also cannot be absolutely discounted or ignored."). The conflict of interest is not only one of divided loyalty but also a financial one where a security guard's act of reporting violations of bail conditions would risk ending a lucrative contract for his employer and potentially his own salary. This creates a significant risk that a company and its employees would observe, if not outright assist, bail condition violations, without bringing them to the Court's attention. *See Boustani*, 356 F. Supp. 3d at 257 ("[T]he defendant in [*Seng* ], who was released to private armed guards from Guidepost in an arrangement similar to what defendant proposes here, was outside of his apartment virtually all day, every weekday; was visited by a masseuse for a total of 160 hours in a 30-day period; and went on an unauthorized visit to a restaurant in Chinatown with his private guards in tow.").

Here, the conflict is only exacerbated by the fact that Alon Alexander is a senior executive of a private security company that provides, among other things, armed security guards. As the head of the Defendants' chosen private security firm acknowledged during the hearing, everyone in the private security industry is familiar with Kent Security. Alon's background and experience as a private security executive, coupled with the fact that he will be paying the individuals responsible for ensuring his compliance with bail conditions, raises serious concerns that the individuals responsible for guarding Alon on a daily basis will not feel sufficiently empowered to stop or report him should he violate any conditions. The situation faced by Oren Alexander, the brother, son, and nephew of Kent Security executives, is much the same. The government is not attempting to impugn the integrity of the private security firm identified by the Defendants, but

the fact of the matter is that a private security company is just that—a private company. The government has no control or even insight into the hiring or training practices of any private security company and does not have a position of supervisory authority over it. *See Raniere*, 2018 WL 3057702, at *7 ("The court in no way impugns the private security firm that Defendant has proposed. This firm appears to employ a number of experienced law-enforcement veterans, and it would surely have a strong reputational incentive to keep Defendant confined. The court nevertheless has general concerns about the use of a private security company to monitor a defendant's home confinement, particularly where the company has been chosen by the defendant, where the Government 'exercises no hiring, training, or supervisory control' over it, and where the court knows nothing about the individuals who would be responsible for monitoring the defendant on a day-to-day basis.").

*Second*, private security guards lack sufficient authority to truly ensure the Defendants' appearance in court as required and to prevent their flight. Private security guards are not law enforcement officers. They are substantially more limited in their ability to stop or restrain a defendant determined to flee or otherwise violate his conditions. *See Valerio*, 9 F. Supp. 3d at 295 ("The questions about the legal authorization for the private security firm to use force against defendant should he violate the terms of his release, and the questions over whether the guards can or should be armed, underscore the legal and practical uncertainties—indeed, the imperfections—of the private jail-like concept envisioned by defendant, as compared to the more secure option of an actual jail."); *Boustani*, 356 F. Supp. 3d at 258 ("Defendant's private jail proposal raises several issues related to use of force. Although Defendant has consented to the use of 'any' force by Guidepost and has waived his right to sue any party in connection with the risks and dangers associated with escape attempts, it is not clear such an agreement is enforceable—and the defense

7

fails to point to precedent suggesting it would be. Defendant cannot consent to the use of deadly force."). Moreover, the questions raised about the use of force go beyond the defendants' ability to consent to the use of force, which the Court rightly questioned at the preliminary detention hearing, and implicate the safety of the community. *Raniere*, 2018 WL 3057702, at *7 ("[A]ny escape attempt would also present the risk of a confrontation between armed guards and Defendant (or his followers) in the streets of New York City, which would mean that any reduction in the Defendant's flight risk from this proposal would be at least partially offset by a greater risk to the community."). This concern is only exacerbated by the Defendant's proposed location of confinement in or around Miami—nearly 1,200 miles from the courthouse where the Defendant will regularly appear in this case. The logistics required to transport the defendant, and for the transportation to happen safely and effectively, places an enormous, undue burden on the courts and federal and local law enforcement, who necessarily must coordinate, track and, potentially, recapture, the Defendants should they chose to flee at a rest stop or in a terminal while in transit. *See Valerio*, 9 F. Supp. 3d at 295 ("[T]he bail package and attempt to replicate a jail in defendant's home would place a burden on the government not contemplated by the Bail Reform Act.").

Courts in this district have also rejected the use of private security in lieu of federal detention as inadequate to mitigate risk of flight. As the district court held in *United States v. Botero*, 604 F. Supp. 1028 (S.D. Fla. 1985), *aff'd*, 853 F.2d 928 (11th Cir. 1988),

> Similarly, the defendant's proposal of a strict curfew and house arrest, even under twenty-four hour guard and an electronic tracking system is inadequate to reasonably assure this Court of Mr. Botero's future appearance. It must be remembered that wherever Mr. Botero stays in the Miami area, he will be only minutes away from a private airfield. Thus, even a short delay in notifying the authorities would permit Mr. Botero to successfully flee. Mr. Botero need only wait for the appropriate time—when his guard was out of the room, asleep or had his attention elsewhere—to get the head start he would need. Moreover, it is not entirely clear what authority and what duty

8

> a private guard would have to prevent Mr. Botero's flight. Certainly, this Court would be reluctant to hold such a guard in contempt if it appeared that he was unable to physically prevent Mr. Botero's flight.

*Botero*, 604 F. Supp. at 1035. All of the concerns that caused the *Botero* court to reject the proposal of private security are present in this case. The Defendants are proposing to be released to a property in the Miami area, where they not only are in close proximity to private airfields and waterways with direct access to the ocean, they also have a long track record of traveling by exactly those means on a regular basis. Each of the Defendants is easily able to arrange for a boat or private aircraft to facilitate his escape, wait for the right moment, and rely on the limits to a private security guard's authority in order to flee. These Defendants' personal characteristics also make them worse candidates for a private security bail condition than in *Botero*. In particular, as alleged in the Indictment, the Defendants, among other things, used surreptitious drugging and deceit to carry out their criminal conduct. And as this Court pointed out during the December 30, 2024 Preliminary Detention Hearing, Alon's significant experience with private security guards may better enable him to evade their restrictions. At bottom, the most private security will be able to do is reduce the Defendants' head starts—not prevent them from fleeing.

And critically, the inquiry here is not whether the Defendants' flight is likely to ultimately be successful nor whether the government can possibly someday extradite them back from a foreign country to face justice. It is whether the conditions are sufficient to *prevent them from attempting to flee in the first place*. And here, they clearly are not. As multiple courts have found, "[t]o the extent [armed private guards] implies an expectation that deadly force may need to be used to assure defendants' presence at trial . . . . [s]uch a conclusion would, in fact, demand a defendant's detention." *United States v. Sabhnani*, 493 F.3d 63, 74 n.13 (2d Cir. 2007); *see also United States v. Dermen*, 779 Fed. App'x (10th Cir. 2019) ("[I]f his risk of flight can be constrained

9

only by constant supervision by private security personnel that are willing to use physical force, the appropriate means to accomplish that is pretrial detention.") (cleaned up).

At Alon's December 30, 2024 preliminary detention hearing, the parties and the Court spent considerable time discussing issues including the ability of private security to use deadly force (or any force at all), and the possibility of the Defendants renting a 55th story apartment with no balcony and only one way in and one way out to ensure the Defendants' appearance.  The fact that it was necessary to seriously consider such measures in the first place demonstrates that the Defendants are serious flight risks and no condition or combination of conditions can ensure their appearance in court as required.

* * *

Accordingly, the Court should reject the Defendants' requests for bail and detain them pending trial.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By:  */s/ Lauren A. Astigarraga*
Lauren A. Astigarraga
Assistant United States Attorney
FL Bar No. 0119473
99 N.E. 4th Street
Miami, FL 33132
Telephone (305) 961-9105
Lauren.Astigarraga@usdoj.gov


EDWARD Y. KIM
ACTING UNITED STATES ATTORNEY
SOUTHERN DISTRICT OF NEW YORK

By:    /s/
Kaiya Arroyo
Elizabeth A. Espinosa
Andrew Jones
Assistant United States Attorneys
26 Federal Plaza, 37th Floor
New York, NY 10278
Telephone (212) 637-2249
Andrew.Jones2@usdoj.gov
